UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **JEREMY DONTAE PARRISH** | * | **CIVIL ACTION NO.  15-0581** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

### REPORT AND RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits.  The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

### Background & Procedural History

Jeremy Parrish protectively filed the instant applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income payments on September 12, 2011.  (Tr. 167-176, 189).  He alleged disability as of July 25, 2011, because of mental impairments and back problems.  (Tr. 183, 189).  The state agency denied the claims at the initial stage of the administrative process.  (Tr. 73-114 ).  Thereafter, Parrish requested and received a September 27, 2012, hearing before an Administrative Law Judge ("ALJ").  (Tr. 36-72).  However, in an October 30, 2013, written decision, the ALJ determined that Parrish was not disabled under the Act, finding at step five of the sequential evaluation process that he was able to make an adjustment to work that exists in substantial numbers in the national economy.  (Tr. 18-31).

Parrish appealed the adverse decision to the Appeals Council. On January 13, 2015, however, the Appeals Council denied his request for review; thus, the ALJ's decision became the final decision of the Commissioner. (Tr. 1-4).

On March 12, 2015, Parrish filed the instant complaint for judicial review. Succinctly restated, he contends that, for various reasons, the ALJ's residual functional capacity assessment is not supported by substantial evidence.

## Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program

throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. § 423(d)(2)(A).  Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

(1) An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2) An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3) An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4) If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5) If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make

an adjustment to other work in the economy.
*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## The ALJ's Findings

**I.     Steps One, Two, and Three**

The ALJ determined at step one of the sequential evaluation process that Parrish did not engage in substantial gainful activity during the relevant period. (Tr. 23). At step two, he found that Parrish suffers severe impairments of schizophrenia, borderline intellectual functioning, and marijuana abuse. *Id*.[1] He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process. (Tr. 24-26).

**II.     Residual Functional Capacity**

The ALJ next determined that Parrish retained the residual functional capacity ("RFC") to perform work at all exertional levels, reduced by the following non-exertional limitations: only able to understand, remember and carry out short, simple instructions; perform simple, routine and repetitive tasks; make simple work-related decisions; tolerate few, if any, workplace

---

[1] The ALJ found that Parrish's alleged impairments of alcohol abuse and lumbar back pain were not severe. (Tr. 23-24).

changes; and sustain only occasional interaction with co-workers and supervisors, but no interaction with the general public. (Tr. 26-30).

### III. Steps Four and Five

The ALJ concluded at step four of the sequential evaluation process that Parrish had no past relevant work. (Tr. 30). Accordingly, he proceeded to step five. At this step, the ALJ determined that, during the relevant period, Parrish was a younger individual, with a limited education and the ability to communicate in English. (Tr. 30). Transferability of skills was not an issue because his lack of past relevant work. *Id*. He then observed that given Parrish's vocational factors, and if he had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled. 20 C.F.R. § 416.969; Rule 204.00. *Id*. However, because Parrish's RFC *did* include non-exertional limitations, the ALJ consulted a vocational expert ("VE") to determine whether, and to what extent his additional limitations eroded the occupational base for unskilled work at all exertional levels. (Tr. 30-31, 63). In response, the VE identified the representative jobs of wall cleaner – medium, *Dictionary of Occupational Titles* ("DOT") Code # 381.687-026 and floor waxer – medium, DOT Code # 381.687-034, that were consistent with the ALJ's RFC and Parrish's vocational profile. *Id*.[2]

---

[2] The VE testified that for these two jobs, collectively, there were 263,000 positions nationally, and 3,400 regionally. *Id*. This incidence of work constitutes a significant number of jobs in the "national economy." 42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

## Analysis

I.   **Chronology of Relevant Medical Evidence and Testimony**[3]

   a)   Evidence Before the ALJ

Parrish was admitted to Searcy Hospital, a mental health facility in Alabama, from August 9-October 26, 2011. (Tr. 253-255). Upon admission, he was diagnosed with schizophrenia and assigned a Global Assessment of Functioning ("GAF") score of 30.[4]  Upon discharge, he had a GAF of 65. *Id*.

At the request of the state agency, Parrish underwent a consultative psychological evaluation on February 7, 2012, with Kimberly Whitchard, Ph.D. (Tr. 262-266). Parrish disclosed that he was applying for disability because the counselor at Searcy Hospital told him that he could no longer work. *Id*. Parrish revealed that he had received SSI from age 4 through 18. *Id*. He took a Haldol injection once per month. *Id*. He had served six months in jail for marijuana possession. *Id*. He occupied his time by standing in the yard talking to his uncle throughout the day. *Id*. He appeared disheveled, with fair hygiene. *Id*. He was apathetic, with

---

[3] Plaintiff does not challenge the ALJ's resolution of the effects of his physical impairments. Accordingly, the ensuing, non-exhaustive chronology focuses upon Parrish's mental impairments.

[4] "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'" *Boyd*, 239 F.3d at 701 n.2 (citing AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (DSM-IV)).
   A GAF of 21-30 is defined as "**[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., largely incoherent or mute)." DSM-IV, pg. 32.
   A GAF of 61-70 indicates "**[s]ome mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships**." DSM-IV, pg. 32.

blunted affect, and euthymic mood. *Id*. He reported paranoid delusions and auditory hallucinations before taking his medication. *Id*. However, the medication helped him with these symptoms. *Id*. His level of intellectual functioning appeared to be in the borderline range. *Id*. His judgment seemed fair. *Id*. He was motivated and cooperative during the examination process. *Id*. Whitchard diagnosed schizophrenia, undifferentiated, and personality disorder NOS. *Id*. His prognosis was poor. *Id*.

On February 27, 2012, non-examining agency psychologist, Donald Hinton, Ph.D., reviewed the limited medical evidence available at the time, and completed a mental residual functional capacity assessment. (Tr. 80-84). He indicated that Parrish was moderately limited in his ability to understand, remember, and carry-out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. *Id*. Hinton opined that Parrish was able to understand, remember, and carry-out short and simple instructions; he could attend for two-hour periods. *Id*.

At the request of the state agency, Parrish underwent a physical consultative examination on March 31, 2012, with Tracy Jacobs, M.D. (Tr. 267-270). At that time, Parrish complained of back pain and schizophrenia. *Id*. His muscles were sore in the paraspinal area. *Id*. He was independent with his activities of daily living, but lived with his grandmother. *Id*. His gait/station were normal. *Id*. He was able to bend and squat without difficulty. *Id*. He was cooperative with the examination, but unable to communicate well. *Id*. Recent and remote memory were poor. *Id*. Jacobs diagnosed schizophrenia and lumbar back pain. *Id*. She opined that Parrish needed to have his IQ tested. *Id*. His responses to questions were limited to "yes, no, or I don't know." *Id*. His lumbar back pain seemed muscular. *Id*. Jacobs opined that

Parrish was *unable* to sit, walk, and/or stand for a full workday, lift/carry objects without limitations, hold a conversation, respond appropriately to questions, or carry out and remember instructions.  *Id*.  Nevertheless, he maintained normal range of motion in all joints.  *Id*.

On July 6, 2012, Parrish was seen at the Monroe Behavioral Health Clinic.  (Tr. 291-293).  He reported that he had moved to Monroe, Louisiana from Alabama about three months earlier.  *Id*.  He had not had his injection of Invega since April 2012.  *Id*.  Parrish's mother reported that he generally was stable, but that she had noticed some old behaviors returning such as conversing with himself and unnatural posturing.  *Id*.  Parrish agreed that he felt better on medication.  *Id*.  He reported drinking alcohol every couple of months during the holidays.  *Id*.  However, he denied alcohol or drug abuse.  *Id*.  He also denied any history of suicidal/homicidal ideation or any history of violent thoughts.  *Id*.  Parrish explained that his last arrest was in 2011 for trying to make money by selling opiates.  *Id*.  However, he had not sold drugs since that time.  *Id*.  Parrish was friendly, but laughed inappropriately at times.  *Id*.

On September 24, 2012, Parrish attended an individual psychology session at Monroe Behavioral Health.  (Tr. 313).  He was quiet, and made poor eye contact.  *Id.*  He barely spoke.  *Id.*  He had been missing sessions because of his mother's work schedule.  *Id.*  He watched a lot of television.  *Id.*

At the September 27, 2012, hearing held in this matter, Parrish testified that his sole hospitalization for schizophrenia was in August 2011.  (Tr. 47).  Furthermore, his monthly Invega injection helped him to stop seeing and hearing things, and helped him feel better.  (Tr. 49, 55-56).  However, he last took his medication months earlier.  (Tr. 48).  Accordingly, voices were telling him to slaughter another boy before that boy could get him.  (Tr. 50-51).  The voices returned *after* he started taking his medication.  (Tr. 51).  He really did not have trouble working as a cook, except when his back started hurting.  (Tr. 53).  He last smoked marijuana in April.

(Tr. 54).

On October 11, 2012, Parrish underwent a psychiatric evaluation administered by Roy Ragsdill, M.D., at Monroe Behavioral Health. (Tr. 308-310, 315-317). Parrish's mother accompanied him to the evaluation, and brought an attorney-supplied form to be completed by the physician. *Id.* Parrish's chief complaint was that he could not get along with other people "and stuff." *Id.* He had started seeing and hearing things again. *Id.* He denied thoughts of harming himself or others. *Id.* Moreover, everything improved while he was on his medication. *Id.* Ragsdill assigned a GAF of 48. *Id.*[5]

Following his initial evaluation, Dr. Ragsdill completed a psychiatric impairment questionnaire on October 15, 2012. (Tr. 297-304). He indicated that he had seen Parrish on one occasion, just a few days earlier. *Id.* He diagnosed schizophrenia, chronic; and borderline intellectual functioning. *Id.* He also assigned a GAF of 48. *Id.* His prognosis was fair to poor. *Id.* He indicated that Parrish had poor memory, mood disturbance, emotional lability, delusions or hallucinations, oddities of thought, social withdrawal, difficulty thinking or concentrating, poor judgment, and poverty of thought. *Id.*

He opined that Parrish was moderately limited in his ability to understand and remember things. *Id.* However, he was markedly limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, and to sustain an ordinary routine without supervision. *Id.* He was mildly limited in his ability to carry out simple one or two step instructions. *Id.* He was moderately limited in his ability to work in coordination with or proximity to others without being distracted by them. *Id.* He was

---

[5] A GAF of 41-50 denotes "**[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting ) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." DSM-IV, pg. 32.

moderately limited in his ability make simple work-related decisions.  *Id*.  He also was markedly limited in his ability to interact with the general public, to ask simple questions, to accept instructions and to respond appropriately to criticism from supervisors and to get along with co-workers or peers without distracting them.  *Id.*  Ragsdill opined that Parrish was not a malingerer.  *Id.*  He was incapable of even low work stress.  *Id.*  His symptoms and limitations manifested themselves more than one year earlier.

Parrish received his Invega injection on October 22, 2012.  (Tr. 320).  He then returned to Dr. Ragsdill on October 30, 2012.  (Tr. 321).  Parrish said that he was doing well and staying out of trouble.  *Id.*  He denied voices or problems with his temper.  *Id*.  His symptoms had improved.  *Id.*

On December 5, 2012, Parrish underwent a consultative mental status evaluation administered by Jon Haag, Psy.D.  (Tr. 323-329).  He obtained a full scale IQ of 75.  *Id.*  Haag diagnosed cannabis abuse and drug-induced psychosis.  *Id*.  The ALJ, however, did not consider Dr. Haag's report because Dr. Haag was not available/willing to appear at a supplemental hearing requested by plaintiff.  Thus, the court will not give effect to the report either.

Parrish returned to Dr. Ragsdill at the Monroe Behavioral Clinic on December 21, 2012.  (Tr. 333).  He reported that he mostly watched football on television.  *Id.*  He denied anger as of late.  *Id.*  He had no delusional content, and did not appear to attend to internal stimuli.  *Id*.  He had not heard any voices lately.  *Id.*  He was stable, with low level of functioning and motivation.  *Id.*  He denied suicidal/homicidal thoughts.  *Id.*

At a February 13, 2013, psychotherapy session, Parrish reported that he heard voices every day, but did not know what they were saying.  (Tr. 335).  He denied suicidal/homicidal ideation.  *Id.*

On March 13, 2013, Parrish returned to Monroe Behavioral Health where he was seen by

Satnam Singh, M.D. (Tr. 337). Parrish denied any psychotic or depressive symptoms. *Id.* He denied substance abuse, and said that he last used about one year earlier. *Id.* He denied any intention to hurt himself or others. *Id.* No paranoia or delusion was voiced. *Id.* His insight/judgment were fair. *Id.* His drug screen, however, was positive for marijuana. *Id.* After the positive screen, Parrish admitted to the nurse that he smoked marijuana every day. *Id.* He was referred to a substance abuse clinic. *Id.*

Parrish returned to Monroe Behavioral Health on April 24, 2013, after missing his appointment on April 10. (Tr. 338). Parrish denied adverse effects from his medication. *Id.* He denied street drug use. *Id.* He also denied audio/visual hallucinations. *Id.*

On June 5, 2013, Parrish again tested positive for marijuana. (Tr. 352). During his visit with Dr. Singh, Parrish admitted smoking marijuana once per week. (Tr. 353). He denied psychotic or depressive symptoms. *Id.* He did not go to substance abuse for evaluation. *Id.* His hygiene was borderline. *Id.*

On August 20, 2013, Parrish underwent a consultative, psychiatric diagnostic evaluation administered by David Williams, Ph.D. (Tr. 340-348). Parrish reported inability to work because he had mood swings and pain. *Id.* He was not smoking marijuana when the mood swings started. *Id.* He last hallucinated toward the end of winter/spring. *Id.* His last dispute/argument was months ago. *Id.* In a typical day, he will tidy up and watch television. *Id.* He was able to manage self-care, personal hygiene, and normal activities of daily living. *Id.* Nonetheless, Williams noted that Parrish had severe impairments in social functioning and interpersonal relations. *Id.* Parrish reported that he last used marijuana about one month earlier. *Id.* His concentration, pace, and persistence were significantly limited. *Id.* He showed pretty significant psychomotor retardation. *Id.* Williams diagnosed schizophrenia, undifferentiated; cannabis abuse; alcohol abuse; and borderline intellectual functioning. *Id.* He assigned a GAF

11

of 45.  *Id.*  Parrish did not appear to be fabricating his symptoms.  *Id.*  His understanding was intact, but concentration, pace, and persistence were significantly limited due to negative symptoms of psychosis and psychomotor retardation.  *Id*.  Social skills were marginal to fair; eye contact was poor.  *Id.*  He was credible.  *Id.*

Williams also completed a medical source statement.  (Tr. 346-348).  He indicated that Parrish had no limitation in his ability to understand, remember, and carry out simple instructions, or to make judgments on simple work-related decisions.  *Id*.  He was moderately limited in his ability to understand and remember complex instructions.  *Id.*  He was markedly limited in his ability to make judgments on complex work-related decisions, interact appropriately with the public, supervisors, and co-workers.  *Id*.  He also was markedly limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting.  *Id.*

A September 5, 2013, progress note from Dr. Singh reflects that Parrish denied hallucinations, or any intention to hurt self or others.  (Tr. 355).

Parrish returned to Dr. Singh on September 11, 2013.  (Tr. 356).  According to his mother, he becomes angry and irritable without his shot.  *Id.*  He was slightly disheveled in appearance.  *Id.*  He denied audio/visual hallucinations or suicidal/homicidal ideation.  *Id.*  He denied street drug use, but refused to receive an assessment for substance abuse.  *Id.*

      b)      <u>Additional Evidence Before the Appeals Council</u>

Parrish returned to Dr. Singh on December 19, 2013.  (Tr. 359).  He reported that he was doing well, denied hallucinations, or feelings of hurting self or others.  *Id.*  He admitted smoking marijuana three weeks earlier.  *Id.*  He did not want to go to substance abuse counseling.  *Id.*

Parrish returned to Monroe Behavioral Health on July 23, 2014, after missing several appointments due to lack of transportation and the weather. (Tr. 12). He reported that he was doing okay, except for pacing and voices from time to time that he ignored. *Id*. He denied suicidal ideation, visual hallucinations, and sleep or appetite problems. *Id*. He had no adverse effects from medication. *Id*. He denied illegal drug use. *Id*. There was no evidence of psychosis. *Id*.

Parrish also saw Dr. Singh on July 23, 2014, for follow-up for schizophrenia, marijuana abuse, mild mental retardation, treatment non-compliance, and failure to attend substance abuse evaluation. (Tr. 14). Parrish continued to smoke marijuana about twice per week. *Id*. His relatives gave him money. *Id*. He admitted hearing voices sometimes, but denied feeling depressed. *Id*. No paranoia or delusion were noted. *Id*. Urinalysis was positive for marijuana. *Id*. His hygiene was below average. *Id*. His attention/concentration were intact. *Id*. He was referred to substance abuse program – again. *Id*.

Dr. Singh completed a Mental Impairment Questionnaire on July 23, 2014. (Tr. 363-368). He assigned a GAF of 48. *Id*. He indicated that Parrish was not a malingerer. *Id*. The questionnaire specifically cautioned the provider to "**[p]lease indicate only those limitations that exist in the absence of drug or alcohol abuse.**" (Tr. 366). Singh indicated that Parrish had marked, limitations (i.e., symptoms present more than 2/3s of the time in an eight hour day) in his ability to perform activities within a schedule/punctuality, and in sustaining an ordinary routine without supervision. *Id*. He also had moderate limitations in his ability to interact appropriately with the public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them; to maintain socially acceptable behavior; and adhering to basic standards of neatness. *Id*. When asked whether

Parrish's symptoms and related limitations were present as far back as July 25, 2011, Dr. Singh replied "non-applicable." *Id*.[6]

## II. Discussion

In his decision, the ALJ reviewed the available evidence, including the hearing testimony, plaintiff's activities of daily living, treatment records, the impressions of plaintiff's treating psychiatrist, the examination reports of the consultative psychologists, and the assessment of the non-examining agency psychologist. (Tr. 26-30). In deriving plaintiff's RFC, the ALJ resolved the opinion evidence as follows,

> [a]s for the opinion evidence, Dr. Williams' opinion is afforded significant weight, as it is consistent with the totality of the evidence that shows the claimant's mental disorder causes problems with social interaction. However, it is noted the claimant was not on any medication at the time of this interview, and that with medication, the claimant's symptoms greatly improve . . . The only serious or "marked" limitations were noted with regard to carrying out complex instructions, making complex judgments and performing the social aspects of work. The state agency's consultant's assessment is afforded great weight, as it is consistent with the evidence of record that shows the claimant retains the ability to understand, recall, and carry out simple instructions and maintain attention for an appropriate period. Dr. Ragsdill's assessment is given little weight, as it was based on his initial evaluation of the claimant prior to commencing a treatment with Invega injections that have mitigated many of the symptoms and limitations present at that time.

(Tr. 29-30).

Plaintiff contends that the ALJ improperly discounted the opinion of his treating physician, Dr. Ragsdill, and improperly excluded some of the limitations recognized by the consultative psychologist, Dr. Williams. Although "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion,"[7] the ALJ cannot reject a medical

---

[6] Dr. Singh may have so responded because he did not begin treating Parrish until 2013.

[7] *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation and internal quotation marks omitted).

opinion without an explanation supported by good cause. *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).

The fact that Dr. Ragsdill issued his opinion prior to Parrish's resumption of Invega treatment *is* a valid reason for discounting his findings. In contrast, although it appears that the ALJ rejected the more severe limitations of functioning included in Dr. Williams' assessment on the basis that Parrish was not on his medication at the time of his interview, Dr. Williams' report reflected that Parrish's medications included Invega. (Tr. 344). Moreover, even if Parrish had not received his Invega injection within one month of his evaluation with Dr. Williams, there is no indication that Parrish endorsed any extraordinary behaviors or symptoms that otherwise were not present when he was current with his medication. Moreover, the ALJ cannot simply "pick and choose" those portions of Dr. Williams' findings that support his decision and discard the remainder. *Loza, supra*.

Ultimately, the ALJ assigned "great weight" to the February 2012 assessment rendered by the non-examining agency physician, Donald Hinton, Ph.D., who, at best, had the benefit of little more than the vague report issued by consultative psychologist, Dr. Whitchard. However, it is not clear that Hinton (in contrast to the disability examiner) even reviewed Dr. Whitchard's report because it was not listed as opinion evidence in his assessment. *See* Tr. 81. Rather, solely the report issued by consultative physician Tracy Jacobs, M.D., is listed as opinion evidence. However, Dr. Jacobs rendered her report *after* the date that Hinton signed off on the assessment. *See* Tr. 83. In addition, Dr. Jacobs opined that Parrish was *unable* to sit, walk, and/or stand for a full workday, lift/carry objects without limitations, hold a conversation, respond appropriately to questions, or carry out and remember instructions. Those limitations clearly were not consistent with Dr. Hinton's assessment.

It is axiomatic that "an ALJ may properly rely on a non-examining physician's assessment when . . . those findings are based upon a careful evaluation of the medical evidence and *do not contradict those of the examining physician*." *Carrier v. Sullivan*, 944 F.2d 243, 246 (5th Cir.1991) (quoting, *Villa v. Sullivan,* 895 F.2d 1019,1024 (5th Cir. 1990)) (emphasis added).[8] Those circumstances are not satisfied here. To the contrary, all three of the examining physicians/psychologists of record at the time of the ALJ's decision, who validly opined on the effects of Parrish's impairments (i.e. excluding Drs. Whitchard and Haag), issued limitations of functioning more restrictive than that of the non-examining psychologist. Accordingly, the ALJ could not rely on Hinton's assessment, and, as the ALJ acknowledged at the hearing, could not substitute his own judgment for that of the medical experts. (Tr. 58). In sum, the ALJ's residual functional capacity assessment is not supported by substantial evidence.

The court further observes that plaintiff supplemented the record before the Appeals Council with an attorney-supplied medical statement form completed on July 23, 2014, by plaintiff's treating psychiatrist, Dr. Singh. This evidence constitutes part of the instant record – provided that it is new, material and related to the period before the ALJ's decision. *See Higginbotham v. Barnhart* 405 F.3d 332 (5th Cir. 2005); 20 C.F.R. § 404.970(b).[9] There is little

---

[8] Also, a non-examining physician/psychologist's opinion does not provide good cause for an ALJ to discount the findings of an examining physician. *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (addressing ALJ's reliance upon non-examining physician's opinion to discount findings of treating physician). The Fifth Circuit cited *Lamb* for the proposition that the reports of non-examining physicians do not provide substantial evidence when the non-examining physician's medical conclusions "contradict or are unsupported by findings made by an examining physician." *Villa, supra* (citing, *Lamb, supra*; and *Strickland v. Harris*, 615 F.2d 1103, 1109-10 (5th Cir. 1980)).

[9] *Higginbotham* cited *Perez v. Chater*, and *Wilkins v. Sec'y Dept. of Health Human Servs.* as support for its finding that post-ALJ evidence is to be considered part of the record. *See, Higginbotham*, 405 F.3d at fn. 3 (*citing inter alia*, *Perez v. Chater*, 77 F.3d 41, 44–45 (2d Cir.1996) and *Wilkins v. Sec'y, Dept. of Health Human Servs*., 953 F.2d 93, 96 (4th Cir.1991) (*en*

question that the additional evidence meets the applicable criteria. The medical source statement is certainly new; the record before the ALJ did not contain a medical source statement by Dr. Singh. Although the Appeals Council purported to discount Dr. Singh's treatment records and statement because they post-dated the relevant period, *see* Tr. 2, there is no indication that Parrish's condition significantly deteriorated between October 2013 and July 2014. Furthermore, Dr. Singh had treated Parrish since at least March 2013, and as a result, was the physician in the best position to consider the longitudinal effects of plaintiff's impairments. Moreover, it is apparent that Dr. Singh took pains to explain the bases for his findings, and conscientiously completed the form, as opposed to simply endorsing disability. In fact, for many areas of functioning, he candidly acknowledged that he did not know what degree of limitation Parrish experienced.

      Of the 23 areas of functioning listed on the questionnaire, Dr. Singh indicated that Parrish experienced a marked limitation in only two: the ability to perform activities within a schedule and consistently be punctual, and to sustain an ordinary routine without supervision. However, the limitations in these two areas of functioning potentially transgress the vocational expert's testimony that a worker who is off task for 20 percent of a workday is unable to maintain employment. (Tr. 65). Accordingly, the court finds that Dr. Singh's assessment is relevant to the period at issue and material. It serves to further undermine the ALJ's RFC.

**III.    Step Five and Remand**

      Because the foundation for the Commissioner's step five determination was premised upon a residual functional capacity assessment that is not supported by substantial evidence, the

---

*banc*)). Both *Perez* and *Wilkins* require that the subsequent evidence be new, material and relevant to the pre-ALJ decisional period. *Perez, supra*; *Wilkins, supra* (citing, 20 C.F.R. § 404.970(b)).

court further finds that the Commissioner's ultimate conclusion that plaintiff is not disabled also is not supported by substantial evidence.

Plaintiff urges the court to enter a judgment awarding benefits. The courts have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits. *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir.1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial and the record clearly showed the claimant's right to benefits). The instant record is not so disposed. At minimum, the severity and effects of plaintiff's mental impairment(s) remain indeterminate.[10]

## Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or

---

[10] In addition, *if* the Commissioner finds that the plaintiff's RFC supports disability, she likely will have to explore whether his continued marijuana use is a contributing factor material to the finding of disability. 42 U.S.C. § 423(d)(2)(C).

response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 18th day of April 2016.

_____
KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE